John Bennett from Jackson-Lewis in Berkeley Heights, New Jersey, for the appellant, Exxon Mobil, and I'll be referring to the appellant in the argument as the company and to the appellee as the union. Thank you. Okay. So let me ask this, and this maybe can frame at least my view of the case. I think you would agree that under the management clause, maybe you wouldn't agree, that the company does not have the authority to unilaterally abolish a bargaining unit. I think you'd agree with that. If that's the case, then regardless of how you might technically construe the management clause, why wouldn't it be appropriate, given the difference we have to afford to the arbitrator, for the arbitrator to take the view that allowing the company to, without any time limitation at all, outsource a portion of the work, either at core or non-core, I think that's the term you used for the employee, allowing the company to indefinitely and permanently outsource a portion of the bargaining unit when people retire or when there's a petition. We have results of the company unilaterally abolishing the bargaining unit, and therefore, especially in conjunction with the bargaining history and the history of the shop, seeing these company unions interpret the management clause to have some kind of temporal limitation in regards to outsourcing to independent contractors. It's a long-term question, but I think you can get my concern. I do, Your Honor. All of those questions are answered by reference to what the parties did bargain in their contract. The answer to your question is, Your Honor, if the parties had intended there to be more limitations on the company's right to subcontract at work, they would have negotiated them. How do we know that? We know that because the general right, Your Honor, in Article 18 of the CBA, provides the company with the right to contract at work as follows. The company may let independent contracts, period, end of quote. And it's not unfettered, Your Honor. The limitations that the parties chose to negotiate to protect the bargaining unit in their contract were twofold, and they're substantial. The company and the arbitrator recognized the company's right to contract out the work is explicitly limited by the two provisions that they negotiated in Article 18 itself. One, the company must notify the union in writing and discuss the reasons for the letting of the contract when it's of a certain monetary value set by the parties. They negotiated that. And they negotiated the second provision, which is very substantial as a protection to the bargaining unit, Your Honor. They negotiated the limitation that while the contractor is performing that work, the company may not, because of a lack of work, demote or lay off any employees qualified to perform that contracted work. Those are the... That's... Those seem to be very different. Those are the kinds of revisions that seem to be very different from whether or not the agreement would allow the company to do away with a portion of the unit, the bargaining unit, by permanently outsourcing that into that company's, or that portion of the company's work. That's... It seems to me that was a devastating concern, that if it's allowed to a traditioner, however, that gives a union the right, under the management clause and the way you're interpreting it, to allow the company to permanently abolish part of the bargaining unit. If I'm wrong about that concern, correct me. Well, the arbitrator was wrong about that concern. So first of all, Your Honor, this involved, as Your Honor knows, this involved one bargaining unit position where the incumbent retired, the company posted the position, and no bargaining unit members applied for the position, and the company contracted out the work of that single... That single position, Your Honor. It's not anywhere near to the destruction of the bargaining unit. And, Your Honor, the cases, the Third Circuit cases in which awards had been vacated, answer Your Honor's question by saying that if the arbitrator doesn't like the balance that the party's own bargaining has struck, it is not for the arbitrator to add, modify, enlarge, or create contract provisions. And, Your Honor, that is where this arbitrator, and I'll quote the language of the Monongahela decision of this court, a presidential decision of this court from December 30, 2019, that is where the arbitrator went off the rails. And that is, Your Honor, once the arbitrator decided that the contracting out provisions that the company and the union bargained were not violated, there was no failure to give the proper notice and discuss the reasons, as in Exception 1, there was no employee laid off or demoted during this contracting out, the arbitrator, under the Third Circuit's decisions, Your Honor, needed to stop right there. Counselor, Judge Bevis, I was on the panel in Monongahela, and Monongahela did not involve a recognition clause that guaranteed that you wouldn't permanently contract out the job exhibits listed in Exhibit 2. So, if you were to go that far, that's an independent possible violation apart from what 18 says. And the other possible theory of violation is Article 7, Section 7B, says previous arbitrators' decisions are binding precedent. And there's some history of arbitral decisions here and weeks of statements that also bear on the meaning that Article 7 incorporates. So, those weren't an issue in Monongahela. Why don't those give a textual hook for the decision here? Because Your Honor, in Monongahela, as I read Your Honor's decision, or the panel's decision, the main issue in that case was the arbitrator going beyond that arbitral delegation of authority by creating contract provisions that were not in the contract. And that is what the arbitrator in the Monongahela decision did, and that is what the arbitrator in this case did. Your Honor, let's look at how this arbitrator did this. Where this arbitrator went off the rails is that she didn't like the bargain that was struck by the parties in terms of limiting the contracting out to a no layoff and a prior notice provision. But that was the party's deal. That was the party's negotiated consideration for the broad subcontracting out clause. And then, so what did the arbitrator do, Your Honor? And this goes to a violation of Article 8 of the arbitrator's authority, which was the touchstone of the Monongahela case, that from the language of, quote, during any period of time when the contracted work is being done, there shall be no layoff provisions. The arbitrator said, well, any period of time means a period of time has to have an end date. That's pure arbitral fiction. Let me grant you that that is a dubious reading of that provision, but that's not the only thing the arbitral decision rested on. It also rested on the history of prior awards that Article 8, Section 7b incorporate in. It also rested on Vice President Weeks and past practice, because labor arbitrations are different from regular arbitrations, but the law of the shop becomes part of what's subject for arbitration here. So why shouldn't we treat a history from the 70s and 80s, which are part of the renewals that are incorporated via Article 8, Section 7b, and then Weeks' statements and other arbitrary decisions that, you know, they're not going to be just going and permanently contracting away these categories? Your Honor, the arbitrator can consider the evidence that the parties present to her in the hearing, but she cannot use extrinsic evidence to change the plain meaning of clear and unambiguous contract terms, which is what she conceded she had here. She just created new ones. Nowhere in this award does the arbitrator say she found Article 8's contracting – Article 18's contracting out provisions to be unclear or unambiguous. Rather, she just – she just read new terms into Article 18 by saying that – Okay. Your – if we just looked at Article 18, your argument would probably be right. But I haven't heard you really respond to the Article 8, Section 7b argument. I haven't heard you respond to the recognition clause about the Exhibit 2 list of employees. I haven't heard you respond to the law of the shop and the past practice. This case is not just about Article 18. You have to deal with those other provisions, too. Please give me your interpretation of each of them as to why they need to be subordinated to what is probably a fair argument based on Article 18 alone. Okay. Your Honor, the recognition clause – we'll start there. The recognition clause states merely that the company recognizes the union as the exclusive bargaining representative of all the employees whose job classifications are listed in Article 2 and who are based at the Clinton facility as being covered by the CBA for purposes of collective bargaining. There is no concept of unit erosion in that recognition clause, your Honor, and there could have been if the parties had intended such a provision. But if Exhibit 2 lists some categories of employees and then one of the categories in Exhibit 2 is going to be written out entirely, that's more than erosion. That's elimination of a job category that's expressly provided for in the text of Exhibit 2. But it's not, your Honor. It was one position for which no bargaining unit employee applied and the company contracted that out. It was one position. As a matter of fact, the contracting out here involved the work of that one material handler position vacated by a retiree for which no bargaining unit employee applied when it was posted, that that was consistent with prior contracting out, your Honor, if we're going to talk about prior practice. And despite the fact which was conceded, your Honor, that there had been no unit erosion. The bargaining unit had remained stable with core positions, i.e., the research technicians that are 80% of the unit, actually having increased. And despite all of that, this arbitrator proceeded to end it. And just because there was no attrition and there were attrition, couldn't that, at some point in the future, result in the, not only the erosion, but the elimination of a bargaining unit? Your Honor, if the union felt that way, this contract ended in 2018 and that's another restriction on the company's rights. It's called bargaining. And then... That doesn't answer my question, Lord. It already answered my initial question that I started with in terms of whether or not it's, within the realm of reason, given the deference we have to afford the arbitrator, the arbitrator would be concerned that there's no temporal limitation on the company's right to outsource, that the end result of that may well be the elimination of a bargaining unit. Five minutes. I haven't really responded to that yet. Well, your Honor... Especially given the law of the shop and the bargaining history and prior arbitration awards and so forth. Your Honor, the arbitrator can be concerned about that as a hypothetical extension of a particular case, but she cannot create the contract provisions that would deal with that. That's for the parties to do in bargaining. Her only responsibility, her only authority under Article VIII was to interpret the actual language of the contract and to not add, enlarge, or modify or create new terms, which is exactly what she did to get to her intended result. Just like all the Third Circuit cases in which the awards have been vacated, Your Honor. Just like the arbitrator in Monongahela created an operating need requirement into the party's he didn't like the... So I could turn around that same question, Your Honor, to the Monongahela case, which is the arbitrator didn't like the fact that the company's final absolute right to schedule vacations would have meant that employees don't get their choice when employees were trying to exercise their choice. And the arbitrator didn't like that result, so he said, you know what? The company can't do that unless there is a operating need, which was found nowhere in the party's contract. And that award was vacated because the arbitrator created and force-fed that provision made out of fiction because it didn't like the result. So the answer to the question, Your Honor, is the same answer that the panel gave in the Monongahela case, is that the arbitrator could tell the party she doesn't like the potential, but she can't create contract terms to deal with it differently than the parties have in their own contract. And Your Honor, the arbitrator awards certainly do become part of the law of the shop, but you can't use the... The arbitrator awards might have helped if, in fact, the arbitrator said, I find Article 18 and the management's right to be ambiguous. But she never said that. She never breathed a word of that, Your Honor. She didn't feel that way. She just didn't like the result. So she changed it by adding terms, which clearly Article 8... Do you have authority for the proposition that the arbitrator can turn to this history only when it's ambiguous or unclear? Because Article 8, Section 7B doesn't say that. It says the arbitrator conclusively determines an issue for the life of this agreement or any renewal or renewal thereof. It doesn't require an ambiguity. Well, but Your Honor, the awards that she relied upon didn't say that the company's subcontracting in those cases was in violation of the contract. She took dicta from Flory, who found that... The 1983 award, who found that the company did not violate the contract. And he, in dicta, said, well, you know, the company's not doing this to erode the bargaining unit. And from that, she says, oh, I'm going to read the Flory award to have a contractual requirement that you can't... That the company can't erode the bargaining unit. It wasn't even the... It wasn't... So you can look... She can look at the awards, Your Honor, but she can't misread them and she can't take dicta in one of them to create new contract provisions in the face of Article 8 that says she cannot add terms to the contract. I would actually say, Your Honor, that since the Flory award, if the parties wanted to bargain something different based on that dicta, that's the key to this. The parties are sophisticated bargaining parties. They could have changed the subcontracting provisions any time that there was an ending of a contract in the bargaining for a new one. Well, how about Weeks's representation? I remember if it's 77 or 78. No, we're not going to go ahead and get rid of these. Then Your Honor, what I would have said to that is that somebody in bargaining right after that should have said, good, then put that in the contract, Mr. Weeks, because that was not contractual. The contract is within the four corners of this very extensive collective bargaining agreement that the parties had, and it's not part of... You mentioned the four corners, but in the labor context, the law of the shop is part of what the arbitrator is considering here. There's not four corners like with an insurance policy. Are you aware of any authority to the contrary that confines us to the four corners here? Your Honor, we have authority in all of our briefs that say the arbitrator cannot use extrinsic evidence, A, when the contract is not ambiguous, and this arbitrator never found that it was. It's so clear that she just... She came to the result that she knew she had to under the contract provisions as written and negotiated, and she didn't like the result, so she changed it by adding language. She changed it by adding this end date to Article 8. There must be an end date if it says period of time, and this concept of unit erosion to the recognition clause, which the parties could have done if that was their intention, but it was not, so they didn't. Counselor, I haven't heard you answer yes or no to a question yet, and I haven't heard you cite words in the arbitrator's decision. Could you stop the invective against the arbitrator and take me to where in the arbitral award is what you claim is her just being angry and making things up. What in the written award demonstrates the point that you're making? Yes, Your Honor. It's at page 68 in the appendix. So, the discussion, Your Honor, in the appendix is 67 through 71. That's the award, and so as to Article 8, Your Honor, after she finds it wasn't violated as it is written, she states that... Okay, where are you? I'm at the bottom of page 19 of the award. Okay, appendix 69. Right. What is the page of the appendix? Appendix 69. So, as to the Article 18 provisions themselves, she says Article 18 expressly limits contracting to a period of time. No, it doesn't. It says during the period of time when the contract is being let out, there shall be no layoffs. All the period of time meant is the word while. While the contract is being let out, there shall be no layoff. It only defines the no layoff provision. So, right there is just not true what she said, but then she takes it even further going off the rails and saying, by definition, a period of time has a start date and an end date. It's during this period of time that's left that the company may not layoff or demote bargaining employees. And then from there, Your Honor, she says Article 8 prohibits the permanent contracting of those positions. That's at the end of the second full paragraph on page 70, appendix 70. She left from a period of time has an end date, therefore it can't be permanent. You just jumped over two paragraphs of analysis of the recognition clause. Yeah, and so we'll get to the recognition clause. She didn't. She paired it with the recognition clause saying these job classifications listed in Exhibit 2 are going to remain for the union. So that's not directly there, it's an additional support. Right, but I will, that's the way she wrote it, Your Honor. That's why I skipped and I was taking them one at a time. So that's Article 8. Article 1, the recognition is on the same page, on page 70. And she just, she says essentially since the job classifications are listed in Exhibit 2, they permanently eliminating, at the end of that same paragraph, permanently eliminating bargain unit positions by contracting those same positions serves to undermine the bargain unit. That's her concept of unit erosion. That's the only place you're going to see it. That's, it's as good as it gets. So she went from the material handler position, the material coordinator position is listed in Exhibit 2, therefore you cannot permanently contract out that position because it would undermine the bargain unit. And Your Honor, I would commend at this point to the court, you know, subcontracting decisions in this context are hard to find. But in footnote 1 of our reply brief, there are cases from other circuits, the Fifth and the Sixth Circuit, and because those are in the subcontracting context, Your Honor, they all say that where the arbitrator finds and has to find that the subcontracting provisions are not violated, they can't then get into their own balancing act and try to balance things like the recognition clause and the structure of the unit to achieve a better result. And that's in the Beard Industries case in the Fifth Circuit and the Sears case in the Sixth Circuit. They're all cited in footnote 1. And it's hard to find a subcontracting case. I did not find one in the Third Circuit, but these are right on point in other circuits for, by way of being persuasive. And it says the arbitrators cannot use a recognition clause to create limits on employers' rights under the CBA to contract out work by trying to achieve some balance with the impact on the bargaining unit when no such terms are in the party's agreement. The Fifth Circuit in the Beard case, the Beard Industries case, said that once the arbitrator recognized the contracting out provisions in the CBA did not limit the company's right to contract out work, the arbitrator's inquiry should have ended right there. Instead, it went on to balance the interest of the unit and the bargaining unit with the company's right to contract out. And in doing so, the Fifth Circuit stated there that the arbitrator dispensed his own brand of industrial justice, which, of course, Steelworkers Trilogy says he cannot do. And his award was vacated. And it also cited that Rock 10 Fifth Circuit case, which is another subcontracting case. And the Sixth Circuit reached the same decision in the Sears case, also cited in that footnote. So the answer to the question is the arbitrator cannot take a recognition clause and add things to it because it would achieve a limitation on the limits of the company's right to subcontract that the parties themselves chose not to bargain. In fact, Your Honor, I would say that the no layoff and no demotion provision during the life of the subcontract is the party's attempt and, in fact, result of negotiating a bargaining unit protection. That's exactly what that is. A no layoff guarantee in consideration for a broader subcontracting outright is very basic and very substantial in labor contract law. That is the protection of the bargaining unit. No employee in the bargaining unit who could do that contracted work is going to be laid off or demoted while that contracting work is being done. That is the protection of the recognition clause and the bargaining unit from this kind of erosion. You can't lay off somebody who can do that work. You would have to end the contract and bring that person back. You can't lay them off. And there's no, in fact, the arbitrator said the company did not violate that. This really is, Your Honor, as you read 67 through 70, this long opinion only has, this award only has three pages of analysis. The rest of it is restating the party's positions. Let me tell you what is conspicuously absent from that three pages of analysis. Nowhere in that analysis is any mention of Article 8. So after adding the end date to Article 8, I'm sorry, the end date to Article 18 subcontracting and the concept of unit erosion to the party CBA to the recognition, the arbitrator never even cited or tried to reconcile her creation of new terms with the provisions of Article 8 limiting her delegated arbitral authority. The discussion portion of the arbitrator's award, Appendix 67 to half of 71, never even mentions that contractual limitation on her authority in Article 8. Why? Because she completely disregarded it and she knew she had to to get to the result. The arbitrator instead called the made-up limitations that she created in Article 18 subcontracting out and Article 1 recognition, she actually used the word inherent. But they're not inherent and in fact, even if they were in her view of inherent, that's not what the parties bargain for when you get an arbitrator. The arbitrator has to determine what the contract provisions said. She laid out all the contract provisions and said the company didn't violate Article 18 in this contracting out. And then she went out and found these other creations in these other two articles and said that they're inherent, but they're not. They're nothing more than the arbitrator's own alterations of the party's contract terms to achieve a result she thought was more fair and just. And in that regard, Your Honor, it's like what the arbitrator did in the FITCO asphalt refinery case that Judge McPhee, you authored in 2004, where the arbitrator didn't like FITCO's zero-tolerance drug testing policy and therefore found it wasn't reasonable by comparing it to other industries. That was outside the contract. That's why it was wrong. The court in the FITCO case determined that an arbitrator can't do that. An arbitrator can't reach outside the party's agreement to reach his or her own notion of industrial justice and cited the provision that the arbitrator has no delegated authority to add or vary or make up new terms of a contract. And that's what this arbitrator did by inserting the end date into Article 18 and the concept of unit erosion in Article 1 and never even reconciled it with Article 8. Everything else she tried to reconcile and interpret. Article 8 is gone from her discussion because it can't be reconciled. And we would rely upon both Monongahela Valley Hospital and the FITCO case where this court found an arbitrator did these things, you know, created these terms to justify his or her own view that if he or she did not impose such a limitation, they didn't like the result. In Monongahela, it would have been the ability of the bargaining unit employees to select their vacation weeks could always be negated. You know, just like this arbitrator said, well, a bargaining unit position might be abolished effectively, a result the arbitrator didn't like. But when the company in the party's contract has the right to take that action, an arbitrator can't create terms to limit or restrict that right beyond what the parties did. And by doing so, this arbitrator clearly exceeded the scope of her authority by injecting the end date restriction into Article 8, the unit erosion concept into Article 1 where the parties had not and did so only because that was her own policy pronouncement, as this court said in Monongahela. But that's what an arbitrator can't do. And the arbitrator in the FITCO case, Judge McKee, the arbitrator, the court vacated that award because it was, quote, based on the arbitrator's own general considerations of the CBA, unquote. That is clearly what this arbitrator did in this case. And when you take the Fifth and Sixth Circuit cases cited in footnote 1 of our reply brief, which are in the subcontracting context, and just take them as the next step in the Third Circuit's analysis that I just cited, an arbitrator cannot find that the company did not violate the subcontracting provisions, but then reach for things like, you know, fairness and unit structure and balancing to impose restrictions on the employer's right to subcontracts that were not contained in the party's agreement. And when they do, the arbitrator's award has to be vacated. Okay, counsel, thank you very much. Any other questions? No, that's all I have time for today. Okay. Thank you, Mr. Bennett. Mr. Bratty. Thank you very much, Your Honor. May it please the Court, Dominic Bratty of the law firm of Bratty Green, LLC, on behalf of the Appellee Independent Laboratory Employees Union. As I said, may it please the Court, I want to address a number of Mr. Bennett's intentions. I'm going to go slightly out of order because I think there's a couple of important points that were just made. One is that I believe that Mr. Bennett actually made the argument that the union is advancing here. In discussing the issue of whether what would happen in the event of a layoff, he said that, quote, they would have to end the contract and bring the employee back, put the employee into the contracting position. The question in this case is whether the union has the ability to permanently subcontract or permanently contract out union positions. That, Mr. Bennett's statement there, indicates it did not have that. And there are many indications in this contract that the arbitrator looked at that said, that a bargaining unit position. What are those provisions? Let's go to the contract. Walk us through that. Okay. If I may, just let me start from the beginning for Judge McHugh's initial question when we started arguing. He asked, could they abolish the entire union? And counsel directed that it was just related to this one position. That was not the case, and it never was the case. The case was always about, and it was elicited in testimony at the arbitration, that the union actually said that they could abolish any position in the union by simply, by means of attrition, as long as they abided by those two, what they considered the two conditions, not to layoff and to provide the notice. That as people retired, they could replace any and all positions they wanted to, because they could, in their mind, call them core or non-core. And they could label any position non-core and replace everyone, including technicians. I will tell you, Your Honors, I was stunned when I elicited that testimony, because that, and we did argue that the recognition clause precludes that, because that is the basis. And we argued very strongly that that would render this an illusory contract. The basis of the labor agreement is that there are going to be positions that are union positions that are protected, and that the company cannot just simply say, well, we've changed our minds and we're not going to have any union employees anymore, which is what the company was looking  I will take you through the text. I'm sorry, Judge Towner, how can we uphold the arbitrator's decision when the parties' agreement contained no stated temporal restrictions on the appellant's right to contract out? Well, as we argued, Your Honor, it did contain restrictions. They're not, and let me take you through it. Essentially, what the company has argued, the appellant's claim boils down to, that the arbitrator ignored the unambiguous language of the contract. And the standard of review was very important, and it was noted by the district court, the standard of review, and it was very understood by the district court, that there must be deficits to the arbitrator, as long as the arbitrator is, quote, even arguably, construing or applying the contract and acting within the scope of his or her authority. And the question, so when the... Does that include the law of the shop? Yes. Okay. Take us through that. Yes. Take us through that. Okay. What are the provisions of the contract you're relying upon? Well, Article 8 and Article 18, and the Article 7, Section 7B, which basically... Article 18, Article 18 permits the appellant to contract out without express limitation, I think. Why shouldn't... She should have stopped right there. Well, let me go through that, because this is crucial. This is key to the company's argument. And they basically say that, in their reply brief on page 2, quote, in their point, they say that the arbitrator, quote, disregarded the clear and unambiguous language vesting Emory Exxon with the right to permanently subcontract the work in question. That is false. There is no mention in Article 18 of permanently contracting out. It's not found anywhere in Article 18 or anywhere else with respect to that. And the district court properly held that it cannot be... It's not in there as a prohibition. It doesn't say you can permanently contract out. It doesn't say you can't permanently contract out. So there is... And the district court properly held you can't disregard language that is not there. So the question... What concerns me about the district court's reasoning is very heavily built on Article 18 and that the arbitrator built on Article 18 and building this all on silence. I mean, Article 18 is an empowering provision for the company. The company may let independent contracts. And then four paragraphs down is a provision that says, and by the way, if you're doing that, you can't demote or lay off employees in the course. And this court, the arbitrator is expanding that greatly. So I think the company is on strong ground as to Article 18, and I was kind of surprised that that was really Exhibit A for the arbitral award. The arbitral award, by the way, didn't really use the Article 8, Section 7B power, which I mentioned and which you're relying on. What do we do about an award that might be premised on leaning on something that we think is a lot shakier than the arbitrator thought it was? Well, I think the arbitrator did rely on Article 7, Section 7B, but silently. And here's the thing. Because she did reference all of the prior arbitrations and she referenced how she was using them and why she was using them, let me just ñ when we say it's a very powerful statement about that they made led contracts, this is why law of the shop and the prior arbitration awards and the so-called parole evidence becomes very important here. Because this is a contract that goes back many, many years. It goes back at least to the 1960s. And what it says is it never even mentions the word subcontract. Not only does it not say permanent or not permanent, it doesn't mention contract. What it says is that they made let, and what that means, and we argued in the arbitration that let equals lease. It's for a period of time. I don't understand the distinction there. Say let does not equal subcontract. I don't get that. They let it out for a period of time. It equals a contract, but for a period of time. Let is a lease. So you can lease a contract. And this is where the arbitrator says ñ now, in a few pages of the decision, she doesn't encapsulate the whole three days of arbitration, all the exhibits that were put forward, et cetera. But I specifically asked the company witnesses, what does let mean? Some of them didn't know. But we argue that let means lease, and a lease is a period of time. It is a specific type of subcontract. It is not a permanent subcontract. And there are other things in the ñ What is your authority for that? Excuse me for mixing terms there. What is your authority for let means? Lease, and therefore, it must have some kind of temporal restriction. Well, actually, at the time I looked up in the Webster's Dictionary, and it is one of the ñ I believe it was number six of the possible definitions. The dictionary said to rent or lease or to become rented or leased. That's what let means. Also, in the contract, further down, it says that these are going to be done by purchase order. So it's not like they're going to be done, you know, just contracted out and forgotten about. They're not phrased as restrictions on the company. They're phrased as authorizations. If you've got to go to definition six in Webster's, perhaps you have a stronger basis for your argument than that. Well, yes.  Article 7, Section B, as far as the prior arbitrations and how the parties interpreted this agreement. Because the parties in 1950 did not interpret this agreement to be, we're going to have a union, but only these people who are currently working for us are protected. Because the company's reading of it is, as long as we don't ñ if we let them retire and we replace them with contractors, that only protects one generation of employees. We argued that that would make it an illusory contract. It would render the recognition clause completely. Wait a second. Why is it illusory? If the contract is for the benefit of employees and not for the benefit of the union as having some independent life beyond protecting these employees from demotion, from layoffs, the other things that are specifically mentioned in Article 18, Paragraph 4, that's what the interest of the flesh and blood employees is. I understand your interest representing a union that has its own people, but this is ultimately for the benefit of the workers. Well, the recognition clause is for the benefit of the workers, but it's not only the benefit of the workers that existed in 1960. It's the benefit of the workers of the union. And the court and ñ the union and the court and the arbitrator and the district court didn't only focus on Article 18, which as your Honor has pointed out, there is ambiguity there. And quite frankly, it could be read both ways. That's the point. That's what the district court recognizes and articulates, that this arbitrator could have just as easily said, no, I'm reading this language to mean that they can do this. But the point is that right or wrong, the arbitrator's decision is based upon not only the Article 18, but also upon silently Article 7, Section 7B, and the recognition clause. Counsel, don't you agree that the reference to period of time has no relevance here because it applies only when there were demotions or layoffs? And there had been no demotions or layoffs here. And I would say it doesn't apply only to that. I understand what your Honor is saying. The arbitrator chose that one, I would say, almost as an example, but there were other arguments made in arbitration. So, for example, like I'm saying, the fact that the word was left, the fact that it's measured in years of $50,000, if a contract exceeds $50,000 per year, it's a year, and it's done by purchase order. These are all things that indicate in the language itself that these are not meant to be, okay, they're contracted out and they're gone forever, which is exactly what the other arbitrators say. The arbitrators in Foley, et cetera, and Stark say, you know, this is obviously a broad contracting out clause. It's a broad clause allowing them to lease. So did the arbitrator go too far? Did the arbitrator go too far by injecting extra contractual concepts like union erosion and when the contract was very clear? Well, no, I don't think the arbitrator injected union erosion into what she was analyzing section Article 18. I think the union erosion arose with respect to the recognition clause. But she did not inject another requirement. What she did was interpret what was there. The main issue is, does this clause allow for permanent? Does it allow for permanent? And it's not clear whether it does or not. I think that's the problem with the arbitrator's award, that he's saying, oh, it doesn't provide this, therefore I can read it into the silence. I take that to be Exxon's argument. So I wonder if you could move maybe beyond Article 18 and tell me. Another of Exxon's arguments is that we have to stay within the four corners of disagreement. What do you make in response to that argument? How do we handle ambiguity and at what level? Does it have to be ambiguous, unambiguous? Is extrinsic evidence banned if it's unambiguous? And what's the relevance of extrinsic evidence, like Vice President's weak statements and Arbitrator Flory's decisions, if we find it unambiguous and then if we find it ambiguous? It's important in both sections, and it is very important, and there's the legal basis for it has to be included. It's the law of the shop, and in this agreement in particular, it states that prior arbitrations are binding upon the parties throughout the life of the contract. So we have the fact that these prior arbitrations, and they were raised by both parties, and both parties realized it was very important. And I think I have it in the brief. I know it was in a district court brief that, you know, one of the company witnesses, when I asked him, well, how are you reading this? How are you getting the interpretation of this? He says, I'm looking back at prior arbitrations. Okay, so we have to look at those prior arbitrations, and we need to look at what the parties intended with respect to the law of the shop, whether it's ambiguous or not. I submit that there is an ambiguity here as to whether you can let means permanent or not permanent, but even abstinent ambiguity. You need to look at what the intentions of the parties were. As Mr. Bennett said, you know, How do you define the intentions of the parties? I'm sorry? How do you do that? How do you define the intentions of the parties if not from the four corners of the document and perhaps the law of the shop?  So the intentions of the parties, we look at first the language of the contract. Then we look at, well, how has it applied for the last 50 years? So the reason why we had an arbitration was because there was a significant change in what the company was doing. They had never done anything like this before. They had never said these jobs are going away and never coming back. Now they said, well, we did say that, and so you need to look at our past parties, and the arbitrator did look at both things. But you look at what the parties said initially was in the contract, what they ultimately did, and then you look at the interpretations by the arbitrators. And you particularly Well, what is to interpret when the contract says that the worker without an express limitation can be contracted out? Well, why is there an interpretation? Maybe years ago in other collective bargaining agreements there was that type of limitation. But here it says, period, they're shown. The contract, expressly they did the contract out. They made the contract. Well, sometimes the shortest phrase is the one that's the most difficult to determine what the intent of the parties were, and that's where there's some ambiguity years later. And that's why you look at what their practice was. Because when those two parties, when they initially negotiated the contract and they said we may elect contracts, the people who were sitting across from each other knew what they meant then, and they acted in accordance with what they meant. And when Mr. Weeks says in 1979, no, no, no, don't think that this means that we could take away the ñ that's never been the case and it never will be the case. When he says that, he's closer in time to when it was actually negotiated. That's why it's important whether it's, you know, whether it's the law of the case or whether you're looking at the parole evidence, whether it's ambiguous or not ambiguous, the history of the parties in a labor agreement is crucial to understanding that agreement. And it's crucial in this case because that is why it's about when the NLRB deferred the case to arbitration, it said in its deferral, you know, the parties had previously contracted out on a temporary basis. Does contracting out on a permanent basis violate the contract? And that was the issue that we presented to the arbitrator. That is how we phrased it because that's how the NLRB phrased it. So now because there's a change, the history becomes important. We argued that this was a change in how the company was approaching things and that it was such a significant change that it would render the contract illusory because within a generation there will be no more unions. Illusory, that's far too strong a phrase. I'm sorry. It's just impossible reading of the contract that maybe the union doesn't like institutionally but all the current union members benefit from. So don't overstate your point. Okay. Well, I understand what you're saying. All I'm saying is that within a generation there could be no ---- if the reading of the contract is how the company would like it to be, then within a generation there could be no union. And that was not what the intention of the parties was, and that's what Mr. Weeks says in 1979. That's not our intention. So we have a very clear expression of what the intention of the parties was with respect to ---- What's the relevance of Weeks' statement? How does that bear on what the contract means? Is there any clause that gives it a toehold? Well, no, because it's relevant because this is not the end, and actually the whole arbitration history is very relevant because it shows that this contract is not susceptible to one clear and defined interpretation. We've been arguing over it in one form or another for close to 50 years. And so that's a very important point, and that's what the district court realized, that it's not susceptible to one claim. It could have just as easily been read the other way. It could be read this way. It could be read that way. We're not here to determine whether the arbitrator was right. We're here to determine whether the arbitrator exceeded her authority. In order, under the Sutter case, in order to vacate this award, we would have to conclude that the arbitrator had absolutely no basis in finding what she did, and that is clearly not the case. When you look at ---- We submit there's more than just the one line. I understand that, in her opinion, she focuses on the one line that says period of time, but you always have to understand that this was an arbitration that went on for days, briefed extensively, and heavily litigated by the parties, and not only before the arbitrator but briefed again at the district court. And it was not just that one line that we were saying that that's why it's a temporal component. It's the fact that, you know, it refers to $50,000 a year. It's done by purchase order. It has a beginning and an end. And most importantly, the law of the shop and the positioning of the conduct of the parties over the last decades was that these were not ---- These were temporary. They filled them. They still ---- And there are still many temporary leasing, even with respect to technicians, which is, you know, what even the company calls a core position. They're allowed to lease for a period of, what, a year sometimes, six months to a year, to determine is this the person we want to have as an employee or will you let them ---- But it's temporary. And that's how it's always been. That's why the law of the case is very important, and that's why the arbitral history is very important. And that's why, specifically, in this contract, bargained for, as Mr. Bennett says, is the fact that we're going to look at the arbitral history. It's going to be binding. It's going to be taken into consideration. Counsel, let me answer that. Bottom line, how is this case so very different than Monahega case? Oh, it's very different from Monahega. And you know what? In Monahega, and I understand Your Honor was on the panel, they had very, very clear language. And the court's decision stormed out by saying that this is the rare situation where not even our heavy degree of deference to the arbitrators can save an arbitrator's award. The Monahega ---- But we're not a rubber stamp either, Your Honor. No, no, absolutely. And I would never ask for that, nor would the union ask for a rubber stamp. You know, we feel that not only did the arbitrator do a thorough analysis and really ---- this was an experienced arbitrator that was chosen, that was on a panel that's chosen by the company and the union. Right? They work off of a certain panel. It's not like they picked them out of a hat. And so this was an experienced arbitrator who looked at everything very, very carefully. And I don't think she ---- she didn't have the passion of saying, I don't like this. That's not ---- that was never her intent. As a matter of fact, you know, she was very fair to both parties. And I would say that at various times both parties were not happy with the way she ruled on particularly evidence or whatever. But ---- and I will also say, personally, no one had an idea of how she was going to rule. When we ended and then we submitted briefs and waited for her decision, I went to the back page and was happy to find out that I had won. But if I had seen that the union had lost, it would not have shocked me because I think that the arbitrator really did give it, you know, a thorough analysis. And the district court similarly gave a thorough analysis with the proper deference because the district court also realized, as your honors do, we may not agree with this. You know, it's the five of us. I need to be the only one who agrees with the arbitrator's decision. But, you know, but we can't agree ---- we can't say that she disregarded the language of this contract. And she specifically did ---- the union, the company wanted to limit her to Article 18. She specifically said, I'm not limited to Article 18. We argued very strongly with respect to the recognition clause. We argued very strongly that you need to consider the past practice under, you know, under Article 7, Section 7B. And even though she doesn't mention Article 8, I mean, that's because it's a guiding principle of all arbitration. Of course the arbitrator cannot exceed her authority. Of course the arbitrator is not going to add to a contract or subtract to a contract, which makes it very different from Monica ---- I practice saying this, Monica Heller, it's very different because in that case it was very clear and very expressed and explicit language. And I'm going to look for it. And to the other cases mentioned by counsel, there was very clear and very expressive language. Oh, in Monica Heller, they say, the final right to allow vacation periods is exclusively reserved to the hospital. It's right there in black and white. And, you know, it was related to vacations. And, yes, you know, they argue, well, that means the company can deny vacations at a period of time. And, yes, they can. But there was a good faith component to it, which was in there, which the court correctly noted, well, that one thing that the arbitrator relied on doesn't necessarily change that. It just makes it a good faith component. So that is a very different case. And the same thing with respect to the Sears-Roper case and the Beard case. As a matter of fact, the Beard case is very much, you know, we cited also as just favoring us because, you know, in this case the arbitrator didn't have a balance. She didn't look at is this good for the, you know, is this a subcontracting that's, you know, warranted by economics, warranted by business offers. Didn't care. It's not even part of the analysis. The only analysis is can they do it, you know? Because if they can do it, they can do it. And if they can't, they can't. Can they do it permanently? It wasn't a balancing seeing, well, is this a good arbitrary, you know, in some contracts that have those provisions, well, you know, it has to be economically viable or there has to be a reason for it. There was no such balancing like that as there was in any of these other cases in Rock, Tennessee or any of those. In the cases, you know, like I said, in Valley Hospital, there was very clear specific language and the court recognized that it's a rare case where you overturn an arbitrator. In order to overturn an arbitrator under the Sutter decision, there has to be no basis for the arbitration award. And as your Honor has correctly pointed out, you know, maybe Article 18 wasn't the best, but that's the actual article that refers to the subcontracting. But all of these relies upon the recognition clause and upon because what the, you know, she basically, like you said, sandwiches in the recognition clause into the argument, but it's in conjunction with. She basically says that because of it, you know, when you read the recognition clause in conjunction with Article 18, that, you know, it precludes permanently contracting out the bargaining unit positions. I'm sorry if I didn't get to all the questions. Is there, if Your Honor has the questions? No, I really think we understand your position unless there's another question. No, I'm not. I think your point was just in time for rebuttal. Yes, Your Honor, and I understand rebuttal is rebuttal and not repetition. Thank you, exactly. Your Honor, the Union's counsel referred to a whole lot of things that aren't in this court's record. You know, I asked the company witness at the hearing, there's no hearing transcripts here. The NLRB decided this. There's no NLRB decision here. You know, there's three, as we briefed in the post-hearing briefs, there's no post-hearing briefs here. And why is that? That's two points on that. One, you don't argue things that aren't in the record before the court. It's not fair to anybody. But number two, why aren't they here? Because they didn't matter, Your Honor, because what this court is here to do as an exercising plenary review, and so we don't even have to find an error in the district court, although the error with the district court was really in the standard. It was basically a standard that's not consistent with the standard that this court most recently found in Monongahela. But this is about the court's plenary review of basically two things, the standard to the arbitration award itself, that part of the appendix that is the award, because you are judicially reviewing the arbitration award for compliance with the standards from our Supreme Court that an award must draw its essence from the words of the collective bargaining agreement. The arbitrator may not dispense his or her own brand of industrial justice. And further, the arbitrator must act within the scope of authority conferred to him or her under the collective bargaining agreement. And it's the standard from the Monongahela case, the most recent pronounced, that if that were lifted into the decision in this case, it's right on. But the reason that we don't have all this other stuff on the record is because the arbitrator's award is your record, Your Honor, and you apply those standards with the plenary review to that award. And that award has to be vacated and cannot be upheld. And respectfully, the only reason the district court upheld it is because the standard applied was an extraordinarily minimal bar necessary to uphold an arbitration award. But as this court and Judge Callen stated, the bar may be low, but it's there. It's not a rubber stamp. But as Monongahela stated, as Judge Ambrose wrote for the court in Monongahela, the bar may be low to uphold an arbitration award, but it still exists, and we are not an amen corner for arbitrator's rulings. And I'll suggest to the court why the union's appendix didn't have hearing transcripts and briefs and whatnot. And if you look at the union's brief, the union in its appeal here is counting on one thing, that the standard for review of an arbitrator's award is so high that this court won't take as close a look at it as its questions in this argument suggest that it has. If you look at the union's brief, all they argue is the standard, and very conclusively say the arbitrator met that standard, end of case. Well, it's not the end of the case because that's not the standard, and therefore the things that are not in the record, I would ask the court to disregard that part of the union's argument. Every time in the record we can't consider it. And all this court needs to do is take that standard that I just articulated right out of Monongahela, apply it to this award, and this award has to be vacated. Rob, as a point of order, I don't believe that Mr. Bennett reserved any rebuttal, but I would just like to say that... Did he reserve rebuttal? I thought he had. No, he hadn't. Oh. And he went way over the 15 minutes. We were on 25 minutes. Well, both sides go way over. I apologize. I just assumed that he had reserved rebuttal. I appreciate that, Judge, but I would just like to respond to the standard issue if I may. Why don't we do that with the 28-J letter again? We're boarding an infinity here in John Dice. John Dice is something I've got to go back and read because it's becoming more relevant to my life. I never thought it would be relevant, but it is. Send us the 28-J letter and respond that way. Unless there's any questions, the appellant will end his year. Thank you, Your Honor. Okay. Thank you very much. And thanks for calling my attention. There was no reserved rebuttal. I missed that one. Thank you, Your Honor.